## OHIO-MIDLAND LIGHT AND POWER COMPANY, Plaintiff, v. COLUMBUS AND SOUTHERN OHIO ELECTRIC COMPANY, Defendant.

Common Pleas Court, Franklin County.

No. 189301.  Decided May 12, 1954.

Vorys, Sater, Seymour & Pease, Columbus, for plaintiff.
Porter, Stanley Treffinger & Platt, Columbus, for defendant.

**OPINION**

By BARTLETT, J.

HELD:

1. THE PROVISION IN THE CONTRACT BETWEEN THE PARTIES. THAT THE DEFENDANT COMPANY WILL NOT SELL OR DELIVER ELECTRICAL ENERGY DIRECTLY TO ANY CONSUMER LIVING UPON THAT PORTION OF ANY ROAD OR HIGHWAY UPON WHICH THERE EXIST LINES OF THE MIDLAND COMPANY (PLAINTIFF), HAS NO APPLICATION TO CONSUMERS LIVING ON THE STREETS OF CHILLICOTHE MANOR SUBDIVISION, EVEN THOUGH THE PLAINTIFF COMPANY HAS LINES UPON U. S. ROUTE 23 NEARBY AND SAID U. S. ROUTE 23 AFFORDS THE ONLY OUTLET FROM SAID CHILLICOTHE MANOR.

2. THE PRAYER FOR A PERMANENT INJUNCTION IS DENIED.

The plaintiff and the defendant are both Ohio corporations engaged in the business of selling electrical energy to consumers generally in the south central part of Ohio. Defendant also produces such energy and sells to plaintiff and others for resale to consumers. Both companies are public utilities under the Ohio law.

In March of 1950, the parties entered into a contract for a new place of delivery of electrical energy by the defendant to the plaintiff for resale by the plaintiff in the area comprising certain townships in Ross and Pickaway Counties. Said contract provides that "unless required so to do by order of the Public Utilities Commission of Ohio," that defendant company "will not sell or deliver electrical energy directly to any consumer living **upon** that portion of any road or highway in the aforementioned territory **upon** which there exist the lines of the Midland Company, except with the knowledge and written consent of the Midland Company." (Emphasis ours.)

In general. plaintiff serves the rural areas between Columbus and Chillicothe, while plaintiff serves Chillicothe and other municipalities in that area.

Said contract between the parties was approved by the Public Utilities Commission, "with the reservation to this Commission of the right to make such change, modification or alterations therein as may be thereafter necessary and proper."

In February, 1954, the owner of certain real estate located just north of Chillicothe filed a plat thereof, known as Chilli-

cothe Manor, subdividing said land into streets and parcels for 140 homes, and about 80 foundations of these homes have been constructed.

A distribution line of the plaintiff runs along the eastern side of Chillicothe Manor, upon U. S. Route 23; but said Chillicothe Manor is not contiguous to said U. S. Route 23 which affords the only outlet from said Manor, said distribution line of the plaintiff being only a few feet from the boundary of said Manor. The plaintiff has no distribution lines on the streets of said Manor.

The plaintiff solicited the privilege of furnishing the electrical current to said Manor; but the owner of the Manor saw fit to request that such service be furnished by the defendant company, and on February 4, 1954, entered into a contract with the defendant company covering the furnishing of such electric service for the construction work in said Manor, as well as service for the 140 homes to be built therein.

Pursuant to its contract, the defendant company constructed its distribution line from its high line down to the 30 foot strip of said Manor, and into the Manor itself; and has substantially completed its distribution system within the Manor, and has since been serving Chillicothe Manor for flood lighting and construction work.

The municipal rate for service by the defendant company is much cheaper than the rural rate available by the plaintiff company. It is conceded by the officers of the plaintiff company that all of its consumers in that general area were being charged the higher rural rate, and it could not lower the rate in Chillicothe Manor without the consent of the Utilities Commission upon the contemplated application of the plaintiff company.

"The policy of the law, or public policy, is a phrase of common use in estimating the validity of contracts. * * *; it is most likely that agreements which tended to restrain trade or to promote litigation were the first to elicit the principle that the courts would look to the interests of the public in giving efficacy to contracts." Law of Contract by Anson, 11th English Ed., 2nd American copyright Ed., by Huffent, p. 241.

"A covenant might be fair as between the parties and yet injurious to the public interest. It would then be held void." Id. p. 252.

"Such for example are cases where the coventor is exercising a public franchise or engaged in a business 'impressed with a public trust.'" Gibbs v. Consolidated Gas Co., 130 U. S. 396, 408-9. Id. note 2 p. 252.

"Courts decline to enforce contracts which impose a restraint, though only partial, upon business of such character,

that restraint to any extent will be prejudicial to the public interest. * * *

"A corporation cannot disable itself by contract from the performance of public duties which it has undertaken, and thereby make public accommodation or convenience subservient to its private interests." Gibbs v. Consolidated Gas Co., etc., 130 U. S. p. 396.

Chief Justice Fuller in his opinion in the foregoing case on page 408 says:

"The supplying of illuminating gas is a business of a public nature to meet a public necessity. It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual effort. (Cases cited.) Hence, while it is justly urged that those rules which say that a given contract is against public policy, should not be arbitrarily extended so as to interfere with the freedom of contract, Printing, etc., Registering Co. v. Sampson, L. R. 19 Eq. 462, yet in the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy." (Cases cited.)

On page 410 Chief Justice Fuller continues:

"Innumerable cases, however, might be cited to sustain the proposition that combinations among those engaged in business impressed with a public or quasi public character, which are manifestly prejudicial to the public interest, cannot be upheld."

"* * * Such agreement necessarily tends to create a monopoly; * * * the interest of the public in the non-enforcement of such an agreement outweighs the interest of the purchaser in its enforcement, and is void." **Lufkin Rule Co. v. Fringeli, et al., 57 Oh St p. 596.**

A contract in restraint of trade is presumed to be illegal, and such presumption must be overcome by the party seeking to enforce it, before relief can be had. **Lange v. Werk, 2 Oh St 519.**

Prior to the passage of the Public Utility Act, an agreement between two public utilities attempting to make a division of territory was void as against public policy. In Telephone Co. v. Telephone Co. 12 N. P. (N. S.) p. 289 (1911) it was held as follows:

"An agreement between two such companies that neither will operate in the territory of the other, or connect with each other's competitors, is against the public policy of the

state, and a court of equity will not enforce such a contract unless the illegal part can be eliminated; and if it appear that the contract would not have been entered into had the exceptionable provisions been omitted, it is evident that the consideration is to that extent unlawful and the contract can not be enforced in any part."

If the agreement in the instant case relating to the division of customers is valid, its validity results solely because of the approval thereof by the Utilities Commission under the authority of §4905.48 R. C. (formerly §614-60 GC).

It will be seen, therefore, that the contract between the plaintiff and defendant in the instant case, and the statute under which the Utilities Commission lent its approval to said contract, are both in derogation of the Common Law and must be strictly construed.

Syl. 2: "In giving construction to a provision of a statute, or a contract, which attempts to abrogate, or modify, a well established rule of the common law, the scope of the provision should not be extended beyond the plain import of the words used if reasonable effect can otherwise be given to it." **Felix v. Griffiths, 56 Oh St 39.**

Plaintiff company contends that the residents of Chillicothe Manor will be "living upon" U. S. Route 23 within the meaning of that term as it has been used by the parties in their contract in question. On the other hand the defendant company takes the position that the consumers in question will be "living upon" the duly dedicated streets of Chillicothe Manor rather than "upon" U. S. Route 23, and, therefore, do not fall within the terms of said contract between the parties.

"Upon now differs little in use from on," Funk and Wagnalls Practical Standard Dictionary.

"Denoting Place, Position, or Location. The words 'on' and 'upon' are frequently employed as prepositions to denote place, position or location, and may be used to express relative, as well as absolute, position. The precise import of the terms when used as descriptive of a place or location is to be determined by surrounding facts and circumstances. When used of place or position with regard to the upper and external part of something, the terms are defined as meaning in a position above and in contact with; being in contact with the surface or upper part of a thing and supported by it; placed or lying in contact with the surface; and it has been said that this is the ordinary and usual signification of the words. However, the terms do not always mean on top of, or resting upon, but may mean attached to, or to or against the surface of, and frequently they are employed in a sense different from 'superimposed' or 'superincumbent,' and not infrequently are

used to designate nearness in place or situation without necessarily implying actual contact or support. In all such cases where the terms are so used it will be found that the context itself makes clear the meaning intended to be conveyed, and in the very physical nature of things negatives the ordinary meaning of support from beneath, or superimposition of one thing over another. In this sense the terms have been variously defined as meaning contiguous to; as meaning adjacent to, and have also been defined as meaning adjoining; alongside of; at; by; near or near to." 67 C. J. S. p. 494.

"While it is both correct and usual to say that St. Louis is **on** the Mississippi River, or that Jefferson City or Smith's farm is **on** the Missouri Pacific Railroad, and we instantly know that what is meant is that these cities, or this farm are near to, along side of, or is adjacent to the river, or the railroad." Turner v. Fidelity and Casualty Co. etc., 202 S. W. 1078, 1080 (274 Mo. 260).

"'on' does not always mean on top of or resting upon, for some times, but less frequently, it means contiguous to. as when we say 'a house on Main Street,'" London Assur. Corp. v. Thompson, 62 N. E. 1066, 1068 (170 N. Y. 94).

"The word 'on' does not always or necessarily imply actual contact, and is not infrequently used to designate nearness in place or situation. Structures are often described as being on a street, or on a road, or on a stream, when in fact they do not physically touch the street, road, or stream. This latitude in the use of the word is recognized in law." Forest View Land Co. v. Atlantic Coast Line R. Co. 91 South, 198, 201 (120 Va. 308).

"'on' means 'upon'—the surface." Riser v. Federal Life Ins. Co., 224 N. W. 67, 68 (207 Iowa 1101); to same effect **Century Dictionary and Clapp Co. v. Fox, 124 Oh St 331, 336.**

An exhaustive search of the cases using the term "upon" a given highway, fails to disclose any authority warranting the conclusion that residents "living upon" the streets of a subdivision, may be considered as "living upon" a U. S. route nearby, merely because such U. S. route is the only outlet from said subdivision.

The contract in question between the parties, as well as the statute under which the Utilities Commission lent its approval of said contract, being both in derogation of the common law, the law requires a strict construction thereof; and the Court is of the opinion that under the decision of the Supreme Court of Ohio in the case of Felix v. Griffith, supra, "In giving construction to a provision of" the contract in question, "the scope of the provision should not be extended beyond the plain import of the words used."

It is, therefore, the finding of this Court, that the consumers of electric energy who may reside on the various streets of Chillicothe Manor, do not and will not within the contemplation of the law and the contract between the parties in the instant case, be considered as "any consumer living **upon**" U. S. Route 23 "upon which there exist the lines of the (plaintiff) Midland Company." In other words, the contract of the parties has no application to the consumers of electrical energy who may reside in said Chillicothe Manor.

The fact that four years after the contract between the parties was entered into, the plaintiff has not an available rate applicable to the residents of said Manor but must seek authority from the Utilities Commission to establish such a rate, is certainly strong evidence that the furnishing of electrical energy to such residents under the circumstances in the instant case, was not within the contemplation of the parties at the time their contract was executed.

It is equally unlikely that the commission contemplated the furnishing of such service by the plaintiff company at the time it approved said contract.

"The Public Utilities Commission is hereby vested with the power and jurisdiction to supervise and regulate public utilities, * * * and to require all public utilities to furnish their products and to render all services exacted by the commission or by law," §4905.04 **R. C.**

The contract between the parties expressly recognizes the authority of the Utilities Commission to require the defendant company to furnish power to such consumers regardless of its contract with the plaintiff company.

Whether the grant of authority to the Public Utilities Commission to supervise and regulate public utilities, and to require them to furnish their products and to render all services exacted by the commission or by law, prescribes a wise plan, is not for the courts to decide; so long as an act of the General Assembly is constitutional, a question of policy is solely for the Legislative branch of our state government to determine; such act does provide the general assembly's plan for regulation and supervision of the Public Utilities of Ohio. **State ex rel v. Glander, 148 Oh St 188.** Such power to regulate and supervise the functions of public utilities having been lodged with the Public Utilities Commission in the public interest, the courts should carefully avoid hampering the agency duly authorized by Constitutional enactment to provide such supervision and regulation.

"The purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such

matters by placing the decision on facts with boards and commissions composed of men equipped with the necessary knowledge and experience pertaining to a particular field." Turner, J., p. 224 in the case of **Farrand v. Medical Board, etc., 151 Oh St 222.**

The courts must exercise care not to place themselves in the position of usurping the power "to supervise and regulate public utilities"; otherwise the courts may find themselves responsible for a lack of such supervision and regulation.

Undoubtedly, if the jurisdiction of the Public Utilities Commission were invoked by Chillicothe Manor or either party to this action, the Commission would be required to determine, in the public interest, which utility should serve Chillicothe Manor; regardless of the contract between the parties; and if the decision required any modification of such contract, then the Commission might order it modified accordingly. The Court is of the opinion that the Commission should be afforded the opportunity to pass upon these matters in the public interest. Certainly, this Court has no right or jurisdiction to determine which utility shall render the service. **Sylvania Telephone Co. v. P. U. C. O., 97 Oh St 202.**

"The application for an injunction is addressed to the sound discretion of the judge who allows it." **Burnet v. Corp. of Cincinnati, 3 Ohio 73, 88; McCord et al. v. Iker, 12 Ohio 387.**

A permanent injunction will be granted only when a party shows a clear right thereto. **Spangler v. City of Cleveland, 43 Oh St 526.** The extraordinary character of the remedy requires that it shall be exercised sparingly and cautiously. **21 O. Jur. p. 1007; Goodall v. Crofton, 33 Oh St 271.** Consideration of public policy and convenience should also be considered.

The Court, therefore denies the prayer of plaintiff company for a permanent injunction.

In view of the Court's decision as announced herein, it is unnecessary to pass upon the other questions raised. Entry accordingly with exceptions by counsel for plaintiff company.